**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LOUNEDIA LOUIS-FRANCOIS**,<br><br>*Plaintiff*,<br><br>v.<br><br>**COMMONWEALTH OF PENNSYLVANIA,** *et al.*,<br><br>*Defendants*. | **Case No. 2:25-cv-04526-JDW** |

**MEMORANDUM**

One's point of view necessarily colors her perception of reality. To someone who suffers a traumatic event, what follows might seem inextricably connected to the trauma. But to an outside observer, the events after the trauma might appear unconnected. In this case, Lounedia Louis-Francois suffered horrible mistreatment at the hands of a spouse of a resident at Pennsylvania's Southeastern Veterans' Center ("SEVC"), where she worked. It was so bad that she called the police. A few weeks later, SEVC terminated her employment. Not surprisingly, Ms. Louis-Francois seeks a connection between the two. But she has not uncovered evidence to support her perception. Instead, the undisputed evidence leaves no factual dispute that SEVC terminated Ms. Louis-Francois over unrelated behavioral concerns, including the way that she treated a different resident and attendance problems. I will therefore grant SEVC's motion for summary judgment.

# I. BACKGROUND

## A. Factual History

The Pennsylvania Department of Military and Veterans Affairs runs SEVC, an assisted living home for elderly veterans and their families in Spring City, Pennsylvania. SEVC hired Ms. Louis-Francois as a Certified Nursing Assistant by initiating an employment contract with her through Infojini, Inc., a staffing agency that employed her. As part of her job responsibilities, Ms. Louis-Francios reported to Lauren Stenson, the Director of Nursing. Brian Gula worked as the Commandant of SEVC, the highest-level manager at the facility, and handled day-to-day operations.

On October 17, 2023, Ms. Louis-Francois and fellow CNA Hannah Neiss were assigned to assist an SEVC resident who I will call "Resident C." The staff considered Resident C to be a difficult resident, so SEVC always assigned two nurses to her at one time instead of the customary single nurse. Resident C had a history of making false reports of mistreatment against the nurses, including Kim Beluch, a Licensed Nurse Practitioner who SEVC employed directly (*i.e.*, not through a staffing agency). At one point, SEVC suspended Ms. Beluch following accusations by Resident C that Ms. Beluch played music into the phone speaker while talking to Resident C and squirted eyedrops into Resident C's eyes. SEVC later determined the claims to be unfounded and restored Ms. Beluch to her position.

On the night of October 17, Ms. Louis-Francois and Ms. Neiss entered Resident C's room and informed her that they would need to assist her with her shower before serving dinner. Resident C pushed back and requested that she take her shower after dinner; Resident C's husband, Mr. C, was present in her room at the time and also expressed irritation at Ms. Louis-Francois and Ms. Neiss. The CNAs maintained that Resident C would need to shower prior to dinner. They then left the room to gather supplies for her shower and bedding to remake her bed. After the nurses returned to Resident C's room, Mr. C approached Ms. Louis-Francois and began "pushing [her] in [her] head, pushing [her] body down the hallway," and calling her the n-word repeatedly. (ECF No. 26-2 at 104.) He continued making demeaning and derogatory comments as he pursued her into the dining room, prompting residents gathered nearby to tell him to stop. Ms. Beluch witnessed the commotion and ran over to intervene while Ms. Louis-Francois sought refuge in the nurse's station. Mr. C continued yelling insults at Ms. Louis-Francois as she barricaded herself in the nurse's station. Security officers then entered the dining room and ended the altercation.

Ms. Louis-Francois called the police, and an officer from the East Vincent Police Department arrived at the scene to take her statement and escort Mr. C off SEVC property. The next day, Mr. Gula called Ms. Louis-Francois to discuss the incident. Ms. Louis-Francois expressed her concerns regarding what happened and complained that she felt like she experienced discrimination due to Mr. C's behavior. Mr. Gula apologized for what

occurred and assured her that SEVC planned to investigate the matter. He also told Ms. Louis-Francois that she would be kept off the unit housing Resident C in the future. He then informed Ms. Louis-Francois that Mr. C was Resident C's only visitor and that SEVC would allow him to return to the facility for visitation. Mr. Gula did not believe he had the legal authority to ban Mr. C from SEVC property. However, Mr. Gula spoke with Mr. C, informed him that SEVC maintains a zero-tolerance policy for the behavior he exhibited, and warned him if he repeated his actions, he would face legal consequences and changes to his visitation rights (to the extent SEVC regulations would permit).

SEVC collected statements from the employees who had witnessed Mr. C's behavior, including Ms. Louis-Francois, and completed an incident report to document what happened. Mr. Gula also sent an email out to all SEVC staff informing them of the incident, assuring that SEVC planned to cooperate with law enforcement and requesting that employees report any suspicious behavior from residents going forward. The email also informed staff that SEVC planned to station security officers on the floors of the housing units during any visits from Mr. C to ensure staff safety going forward. Prior to the incident on October 17, Ms. Louis-Francois had never met Mr. C, and no SEVC staff who had encountered him reported instances of racist or discriminatory behavior. Ms. Louis-Francois never encountered Mr. C or Resident C again following the incident.

On November 6, 2023, a fellow SEVC nurse reported to SEVC supervisors that she observed Ms. Louis-Francois speaking to a different SEVC resident, Resident L, in a manner

she "didn't like." (ECF No. 26-16 at 1.) SEVC supervisors spoke with Resident L, who reported that Ms. Louis-Francois remarked that Resident L was "ringing too much" after she rang her bell a couple of times to request assistance using the bathroom, making Resident L feel as though Ms. Louis-Francois didn't want to take care of her. (*Id.*) SEVC collected statements regarding the incident from the SEVC nurse who witnessed and reported it and from Ms. Louis-Francois.

Apart from the incident with Resident L, SEVC also recorded several time and attendance issues involving Ms. Louis-Francois between October 2, 2026, and November 7, 2026, that placed her in violation of SEVC's Standards of Conduct and Work Rules. On each of the recorded occasions, Ms. Louis-Francois either showed up late for her scheduled shift, missed her shift without calling ahead first, or called off work. In total, SEVC noted nine instances of time and attendance infractions.

On November 8, 2026, Ms. Stenson emailed Dawn Donhauser, the Staff Scheduler, and instructed her to contact Infojini to cancel Ms. Louis-Francois's employment contract with SEVC "[due to] the statements and attitude she gave the resident." (ECF No. 26-26 at 2.) Ms. Stenson didn't speak with Mr. Gula concerning her decision to recommend Ms. Louis-Francois's termination. That same day, Infojini emailed Ms. Louis-Francois an Involuntary Termination notice, informing her that SEVC terminated her assignment due to "a behavior issue." (ECF No. 26-11 at 1.)

### B. Procedural History

On August 8, 2025, Ms. Louis-Francois filed suit against SEVC, Infojini, and Mr. Gula in his individual capacity. Her complaint asserts claims of racial discrimination, retaliation, and hostile work environment under Title VII, the Pennsylvania Human Rights Act, and 42 U.S.C. § 1981. She also brings claims asserting First Amendment retaliation and violations of the Fourteenth Amendment's Equal Protection Clause. I dismissed Infojini from the case following arbitration proceedings between the company and Ms. Louis-Francois. On April 4, 2026, SEVC and Mr. Gula moved for summary judgment on Ms. Louis-Francois's claims. I held a hearing on October 29, 2026, and took the motion under advisement.[1]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). At this stage, I do not weigh the evidence and decide the truth of the matter but instead

---

[1] As part of our Court's ongoing civic outreach efforts, I conducted the argument at Lehigh University in Bethlehem, Pennsylvania. I thank both counsel for their willingness to participate in this hearing, which I recognize may have posed some degree of inconvenience but which greatly aided the Court in fulfillment of an important part of its mission of public outreach and civic education.

determine only whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In opposing summary judgment, the non-moving party may not merely deny the allegations in the moving party's pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *See Scott*, 550 U.S. at 380 (citation modified); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). Instead, the nonmovant "must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

## III. ANALYSIS

### A. Race Discrimination/Retaliation

The familiar *McDonnell Douglas* framework applies to Ms. Louis-Francois's claims of race discrimination and retaliation against SEVC[2] under Title VII, Section 1981, the Equal Protection Clause, and the PHRA. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999); *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997). To prevail on her claims, she must first establish a *prima facie* case. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). If she makes that showing, the burden shifts to SEVC to articulate a legitimate, non-retaliatory reason for terminating her employment. *See id.* If SEVC meets that burden, the burden shifts back to Ms. Louis-Francois to establish that

[2] For ease, I will refer to both SEVC and Mr. Gula as "SEVC" going forward.

SEVC's stated reason was pretext. *Id.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Although the burden of production shifts back and forth under this analysis, Ms. Louis-Francois always maintains the ultimate burden of persuasion. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

To obtain summary judgment in this case, SEVC must show Ms. Louis-Francois's "inability to raise a genuine issue of material fact as to either: (1) one or more elements of [her] prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).[3]

### 1. *Prima facie* case

To establish a *prima facie* case of disparate treatment in violation of Title VII, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of intentional discrimination. *Jones*, 198 F.3d at 410–11. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) she engaged in activity protected by Title VII; (2) the employer

[3] Neither Title VII nor the PHRA authorizes liability against an individual supervisor or employee. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996); *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002). Ms. Louis-Francois's Title VII and PHRA claims against Mr. Gula therefore fail outright. Even if Ms. Louis-Francois could maintain individual claims against him, however, they nonetheless fail on the merits for the reasons I discuss in this section.

took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).

**a. Forfeiture of arguments**

SEVC's Memorandum in support of its summary judgment motion does not make any argument about Ms. Louis-Francois's *prima facie* case for race discrimation or retaliation under Title VII, Section 1981, or the PHRA. Instead, it jumps right to the pretext analysis. For example, in addressing race discrimination, the Memorandum points to the legitimate, non-discriminatory reasons for Ms. Louis-Francois's termination and then argues that "Plaintiff has brought forth no evidence whatsoever to discredit these legitimate, non-discriminatory reasons for her termination." (ECF No. 25-1 at 5.) It concludes that section by arguing that the "burden lies with Plaintiff to cast doubt upon the legitimate non-discriminatory reasons proffered by the Defendants, and she has failed to do so." (*Id.* at 7.) But other than reciting the elements, it never addresses causation or any other element of a *prima facie* case. Similarly, SEVC's argument about retaliation focuses on the legitimate, non-discriminatory reasons for Ms. Louis-Francois's termination and then challenges Ms. Louis-Francois's ability to dispute those reasons. (*See id.* at 8.) But again, other than a recitation of elements, it never analyzes her proof of a *prima facie* case.

When a party fails to raise an argument, courts deem the party to have forfeited the argument. *See Barna v. Bd. Of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017). In civil cases, courts only address such an argument "when the public interest requires that the issues be heard or when a manifest injustice would result …." *Id.* (citation modified). In this case, SEVC did not raise a challenge to the *prima facie* case, so it has forfeited any argument that Ms. Louis-Francois has not established a *prima facie* case. At oral argument, I asked SEVC's counsel why the brief didn't address this point and whether it meant SEVC was waiving any argument about the *prima facie* case. Counsel responded that a challenge to a count necessarily includes a challenge to all elements of that count. (Tr. at 4-9.[4]) I disagree. SEVC needed to flesh out its challenge to the *prima facie* case to preserve that argument. Otherwise, it is asking me to do its work for it in determining whether Ms. Louis-Francois has established her *prima facie* case.

While that is enough for me to conclude that SEVC forfeited any challenge to the *prima facie* case of discrimation or retaliation under Title VII, Section 1983, and the PHRA, I still have to analyze the *prima facie* case of discrimination in connection with Ms. Louis-Francois's Equal Protection Claim, and I have to do the same for the retaliation claim in connection with her First Amendment retaliation claim. I therefore will address the *prima facie* case for all these claims at once, even though I conclude that SEVC forfeited some of its challenges to them.

[4] Citations to "Tr." refer to the Transcript of the oral argument on October 29, 2026.

**b. Race discrimination**

There is no dispute that Ms. Louis-Francois, a black woman, is a member of a protected class, she was qualified for her job, and her termination qualifies as an adverse job action. Thus, the only element of a *prima facie* case of race discrimination at issue is whether SEVC acted based on Ms. Louis-Francois's race. She has no evidence that it did. Her arguments in favor of establishing causation suffer at least three flaws.

*First*, Ms. Louis-Francois contends that SEVC's treatment of Ms. Louis-Francois after her call to the police gives rise to an inference of discrimination. I disagree. Ms. Louis-Francois's race did not change after she called the police; it's an immutable characteristic. So, it's not clear why her race would cause SEVC's treatment of her to change after her complaint to the police. Ms. Louis-Francois also contends that SEVC's meager response to the way that Mr. C treated her demonstrates racial discrimination. But again, she doesn't provide a basis for that inference. The incident was race-based, to be sure. And she might have thought the response was inadequate. But an inadequate response does not give a jury a reasonable basis to infer that SEVC had a discriminatory motive or mindset.

*Second*, Ms. Louis-Francois contends that SEVC did not follow its internal disciplinary policies and that that failure demonstrates racial bias. But again, she doesn't present any evidence of a circumstance that might tie the way that SEVC imposed

discipline to Ms. Louis-Francois's race. Without some evidence, there's no basis for an inference in her favor, only a logical leap.

*Third*, Ms. Louis-Francois argues that SEVC treated her differently than a comparable employee, Ms. Beluch, who was also the subject of a complaint from a Resident (Resident C). A plaintiff can establish an inference of discrimation "by demonstrating that similarly-situated persons from outside the protected class were treated more favorably." *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (citation modified). Comparator employees need not be identical but must be similarly situated in all material respects. *In re Tribute Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018). That analysis requires more than "broad generalities in identifying a comparator." *Stradford v. Sec'y Pa. Dept. of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022) (citation modified). That way, courts ensure that they "isolate the factor allegedly subject to impermissible discrimination." *Id.* (quotation omitted).

Ms. Louis-Francois cannot make that showing with respect to Ms. Beluch. The two held different jobs with different roles. SEVC employed Ms. Louis-Francois through Infojini under a staffing contract as a CNA, while Ms. Beluch worked directly for SEVC as an LPN supervising the CNAs. (*See* ECF No. 26-17 at 10–11.) In addition, there is no evidence that Ms. Beluch had any time or attendance issues at work. Ms. Beluch, as a full-time SEVC employee, was a union member, but Ms. Louis-Francois was not. And the circumstances of the complaints that Resident L made about Ms. Louis-Francois and

Resident C made about Ms. Beluch were meaningfully different. Resident C was a notoriously difficult resident, and SEVC determined that her complaints against Ms. Beluch were unfounded. But Resident L did not have that reputation when she complained about Ms. Louis-Francois, and another nurse overheard Ms. Louis-Francois's dispute with Resident L, which allowed SEVC to corroborate Resident L's complaint about Ms. Louis-Francois.

**c. Retaliation**

To prove a *prima facie* case of retaliation under Title VII, Ms. Louis-Francois must demonstrate that she engaged in protected activity that caused SEVC to take an adverse action against her. *See Moore*, 461 F.3d at 340–41. And, to prove a First Amendment retaliation claim, Ms. Louis-Francois must show that she spoke as a citizen on a matter of public concern and that that speech was a substantial or motivating factor in SEVC's retaliatory action against her. *See Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014). Although a First Amendment retaliation claim is not subject to the *McDonnell Douglas* framework, the causation analysis is the same as it is for the *prima facie* case of Title VII retaliation.[5] *See Brennan v. Norton*, 350 F.3d 399, 420 (3d Cir. 2003).

Even assuming that Ms. Louis-Francois's police complaint and her complaint to Mr. Gula the following day were protected activity under both Title VII and the First

---

[5] If the plaintiff proves both elements, the burden shifts to the employer to prove that "the same action would have been taken even if the speech had not occurred." *Id.* (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).

Amendment, she cannot demonstrate that her speech played a role in SEVC's termination decision. A plaintiff may prove causation by showing either (1) an "unusually suggestive" temporal proximity between the protected speech and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse*, 126 F.3d at 503–04). If the plaintiff fails to prove either, she must instead show that the trier of fact could infer causation. *Id.* The types of evidence that Ms. Louis-Francois can proffer includes "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

SEVC terminated Ms. Louis-Francois three weeks after she made her complaints. There is no brightline rule for what qualifies as "unusually suggestive" temporal proximity, but the Third Circuit recognizes a period of a couple days as sufficient. *See, e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (two days); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). The Third Circuit has also held a period of three weeks insufficient to establish an unusually suggestive temporal proximity. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). Given

the holding in *Thomas*, I conclude that the timing of SEVC's termination of Ms. Louis-Francois, standing alone, is not unusually suggestive of retaliation.[6]

There is also no evidence of a pattern of antagonism after her police report. In the race discrimination section of her brief, Ms. Louis-Francois asserts that SEVC treated her badly, and differently, after her police complaint. But the record doesn't support that argument. For example, she claims that Mr. Gula told SEVC staff to handle matters in house rather than calling the police. But his email to staff notes that Ms. Louis-Francois was within her rights to call the police and says nothing to discourage future calls to the police. (*See* ECF No. 25-17.) She also complains that Ms. Stenson sent her home after the incident with Mr. C and that Mr. Gula "banned" her from working on the same unit. But sending her home after such an incident doesn't demonstrate retaliation, and she has no evidence of a ban other than hearsay from someone in "Security." (ECF No. 25-4 at 135:25-136:7.)

Ms. Louis-Francois relies on several additional factors to bolster her causation argument, many of which overlap with her arguments about prejudice. *First*, she argues that SEVC has offered a "shifting reason" for her termination. (ECF No. 26 at 15.) But I disagree that there was such a shift. The email that Ms. Stenson sent to Infojini terminating Ms. Louis-Francois's contract stated that "[t]he reason for your termination

---

[6] At least one district judge has held that a shorter period of 17 days is not unusually suggestive. *See Killen v. N.W. Human Servs., Inc.*, No. 06-4100, 2007 WL 2684541, at *8 (E.D.Pa. Sept. 7, 2007).

is a behavior issue." (ECF No. 26-11 at 2.) Mr. Gula testified during his deposition that the incident with Resident L "was one of the reasons" SEVC decided to terminate her contract, in addition to "time and attendance issues." (ECF No. 26-6 at 87:4–18.) Ms. Stenson confirmed during her deposition that SEVC supervisors discussed Ms. Louis-Francois's time and attendance issues in connection with the decision to cancel her contract with SEVC. Although the email is silent regarding the precise "behavior issues" underlying her termination, the phrase "behavior issues" can encompass both of SEVC's termination rationales—the incident with Resident L and the time and attendance concerns. Thus, there is no shifting rationale.

*Second*, Ms. Louis-Francois argues that "[Ms. Stenson] and [Mr. Gula] demonstrated their discriminatory intent against [her] when they immediately recommended her termination without conducting any form of investigation." (ECF No. 26 at 16.) As an initial matter, Ms. Louis-Francois has no evidence that Mr. Gula recommended her termination. As for Ms. Stenson's recommendation, she clarified during her deposition that the SEVC disciplinary process differed between regular staff and contract staff like Ms. Louis-Francois. Part of the difference stems from the fact that regular staff are part of the nursing union, while contract staff are not. Ms. Louis-Francois's reliance on SEVC's failure to follow its disciplinary procedure therefore cannot serve as pretext because that policy didn't apply to her. Even if it did, SEVC provided evidence showing that Ms. Louis-Francois's termination held no connection to her race

or her complaints. Absent contrary evidence, SEVC's departure from its alleged "progressive disciplinary principles" is insufficient to rebut its legitimate non-discriminatory reasons. *See Grasty v. DaVita, Inc.,* No. 24-2584, 2025 WL 2388298, at *3 (3d Cir. Aug. 18, 2025) (citing *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 333 & n.10 (3d Cir. 2016)).

Ms. Louis-Francois also argues, in the pretext section of her Opposition, that Ms. Stenson "has a history of targeting and retaliating against employees that complain," such as Ms. Beluch, whom Ms. Stenson "subjected to months of harassment" after she voiced concerns regarding Resident C. (ECF No. 26 at 9.) Even if I consider that argument as part of the causation analysis, it does not save the day. There is no evidence, outside of Ms. Louis-Francois's assertion, that Ms. Beluch experienced months of harassment by Ms. Stenson. There is also no evidence that Ms. Beluch complained to Ms. Stenson, or any other SVC supervisor, that she experienced discrimination from Resident C. The best support for Ms. Louis-Francois's argument is Ms. Beluch's deposition testimony stating that she believed Ms. Stenson "targeted" her for documenting her concerns regarding Resident C's history of accusing SVC staff of mistreatment. (ECF No. 26-17 at 35:14-18.) But Ms. Beluch's unsupported speculation that Ms. Stenson targeted her is not evidence from which a reasonable juror could conclude that Ms. Stenson targeted Ms. Louis-Francois for complaining to the police.

**2. Legitimate non-discriminatory reason**

SEVC has explained that it terminated Ms. Louis-Francois based on Resident L's complaint and Ms. Louis-Francois's time and attendance issues. Those reasons are legitimate and non-discriminatory, and they satisfy SEVC's burden, which is "relatively light." *Krouse*, 126 F.3d at 500 (citation modified). Ms. Louis-Francois does not argue otherwise.

**3. Pretext**

Once an employer articulates legitimate reasons for its action, to avoid summary judgment the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious retaliatory reason was more likely than not a determinative cause of the employer's action." *Daniels*, 776 F.3d at 198 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)) (citation modified). A plaintiff may do this by either (1) circumstantially or directly discrediting the employer's proffered reason; or (2) citing evidence, circumstantial or direct, that discrimination more likely than not served as a motivating or determinative cause of the adverse employment action. *Fuentes*, 32 F.3d at 764. To discredit the employer's proffered reason, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" providing that a reasonable factfinder could rationally find the reason unbelievable. *Id.* at 765. Ms. Louis-Francois grounds her pretext argument in what she identifies as "clear

inconsistences in [SEVC's] purported rationale for terminating her employment." (ECF No. 26 at 16.) Her arguments are unpersuasive.

*First*, Ms. Louis-Francois argues that SEVC "shifted [its] rationale" for her termination. (*Id.*) But as I've explained, there was no shift.

*Second*, Ms. Louis-Francois complains about the process of her termination, including the failure to impose progressive discipline. But the evidence shows that the progressive discipline policy did not apply to her. And even if it did, the failure to follow it does not provide a basis, on its own, to disbelieve SEVC's termination decision.

Ms. Louis-Francois's remaining arguments fail to move the needle. She argues that "the curious and disputed circumstances of [her] abrupt termination" establish pretext. (ECF No. 26 at 16.) But she fails to point to any evidence demonstrating such circumstances exist. Even if she did, a successful showing of pretext requires more than evidence "that [SEVC's] decision was wrong or mistaken." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765). She also invokes temporal proximity, but the timing in this case does not provide a reason to disbelieve SEVC or to think discrimination was more likely at play.

### B. Hostile Work Environment

To succeed on a hostile work environment claim, a plaintiff must show: (1) she suffered intentional discrimination because of her race; (2) the discrimination was "severe or pervasive;" (3) the discrimination detrimentally affected her; (4) the discrimination

would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017). The first four elements establish a hostile work environment and the fifth determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

There's little question that Ms. Louis-Francois has evidence to support the first four elements. Mr. C's use of the n-word targeted Ms. Louis-Francois because of her race. And a single use of that word in a workplace setting is severe enough to create a hostile work environment. *See Castleberry*, 863 F.3d at 264–66. The use of the word detrimentally affected her, and it would affect a reasonable person.

However, Ms. Louis-Francois does not have facts to demonstrate *respondeat superior* liability. The cases recognizing a single use of the n-word as severe enough for a hostile work environment claim all involve use of the slur by supervisors or co-workers. *See, e.g.*, *Castleberry*, 863 F.3d at 265 (collecting cases). In this case, though, Mr. C was a third-party, non-employee of SEVC. In an unpublished opinion, a panel of the Third Circuit concluded that "[a]n employer may be liable under Title VII for the harassing conduct of third parties if the employer was aware of the conduct and failed to take reasonable remedial action in response." *Johnson v. Bally's Atl. City*, 147 F. App'x 284, 286 (3d Cir. 2005) (citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073–74 (10th Cir. 1998)). District courts in this Circuit have applied *Johnson*'s logic. *See, e.g.*, *Emery v. Uber Techs., Inc.*, No.

320CV05156FLWZNQ, 2021 WL 941879, at *6 (D.N.J. Mar. 12, 2021); *Thomas v. Solera Senior Living LLC*, No. 25-CV-4944, 2025 WL 2901065, at *4 (E.D. Pa. Oct. 10, 2025). This accords with the dominant trend among Courts of Appeals to recognize employer liability under Title VII for harassment committed by non-employees. *See O'Neill v. Trs. of Univ. of Pennsylvania*, No. CV 25-1129, 2025 WL 3047884, at *9 (E.D. Pa. Oct. 31, 2025) (collecting cases).

Ms. Louis-Francois has no evidence to suggest that SEVC permitted a racially hostile environment. *First*, she has no evidence that Mr. C engaged in similar, race-based harassment of SEVC staff. Ms. Louis-Francois does not identify any evidence that Mr. C engaged in any similar conduct before the incident on October 17, 2023. She does claim that his wife, Resident C, engaged in such conduct.[7] But even if I were to equate Resident C and Mr. C for these purposes, the only evidence that Ms. Louis-Francois offers to support her claim is her own testimony about what she claims to have heard second- and third-hand from other, unidentified staff at SEVC. That's not admissible evidence, and it does not create a genuine factual dispute requiring a jury's resolution.

*Second*, Ms. Louis-Francois argues that SEVC didn't do enough to discipline or reprimand Mr. C for his conduct. Yet the record shows that SEVC became aware of the October 17 incident the day it occurred and took reasonable remedial steps in response.

---

[7] At the hearing, SEVC's counsel argued that Resident C had dementia, which minimized the significance of her conduct. That fact is not in the record before me, though, so I do not consider it.

Mr. Gula called Ms. Louis-Francois the day after and assured her that SEVC would address the situation and cooperate with law enforcement. He also emailed SEVC staff at large to inform them of the incident and encourage them to report any unauthorized behavior with visitors. Mr. Gula spoke with Mr. C and warned him of potential consequences if further issues occurred. SEVC took statements from witnesses, drafted incident reports, and added security officers as "a presence in rounding on the floors" to ensure the safety of staff. (ECF No. 26-6 at 107.) SEVC prevented Ms. Louis-Francois from returning to Resident C's floor. Although banning Mr. C from SEVC property would have been the most effective remedial measure, Mr. Gula did not believe he had authority to do so. SEVC took other reasonable remedial actions the absence of that option.

In any event, a failure to take disciplinary action, standing alone, does not create a hostile work environment unless it leads to additional incidents. If it does, it might demonstrate that SEVC was negligent because it knew or should have known that Ms. Louis-Francois would endure a hostile environment. And the Supreme Court has recognized that "an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 446 (2013). But that's not the situation in this case. An employer's disciplinary steps against other employees or third parties are relevant only if it fails to quell a hostile environment. In this case, because the hostility never recurred, the discipline or lack of it is irrelevant.

## IV. CONCLUSION

While Ms. Louis-Francois sees her termination through the prism of the trauma that Mr. C inflicted on her, the evidence doesn't support her perspective. Instead, treatment of Ms. Louis-Francois was unacceptable, and she was within her rights to call the police after it happened. But SEVC was also within its rights to terminate her for the other problems that it experienced with her work. I will therefore grant SEVC's judgment motion. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

November 16, 2026